# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**SHERON PURNELL**,                                    *

    *Plaintiff*,                                           *

v.                                                    *        Civil Case No: 1:21-cv-3202-JMC

**CONVERSE et al**,
                                      *

    *Defendants.*

    *    *    *    *    *    *    *    *    *    *    *    *

## <u>MEMORANDUM OPINION</u>

Plaintiff Sheron Purnell ("Plaintiff") filed an Amended Complaint (ECF No. 33) alleging five counts against Detectives Zachary Converse ("Detective Converse") and Shane Musgrave ("Detective Musgrave") of the Worcester County Sheriff's Office in both their individual and official capacities. The claims include, among other Maryland state law claims and other state and federal constitutional claims, excessive force and unlawful search or seizure under both the United States Constitution and the Maryland Declaration of Rights. *Id.* at pp. 10–15.[1] Presently before the Court is Defendants Zachary Converse and Shane Musgrave's Motion to Dismiss, or in the Alternative, for Summary Judgment. (ECF No. 36). In determining this Motion, the Court further considered Plaintiff's Opposition to the Motion (ECF No. 41) and Defendants' Reply in further support of their Motion (ECF No. 42). No hearing on this Motion is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons explained below, Defendants' Motion, treated as a motion to dismiss, is GRANTED without prejudice in part and DENIED in part.

---

[1] When the Court's pin cites reference specific page numbers, the Court is referencing the page numbers located in the electronic filing stamps provided at the top of electronically filed documents.

## I.   BACKGROUND

"At the motion to dismiss stage, the Court takes the allegations of the [Amended Complaint] as true, . . . and [it] construes any disputed allegations in the light most favorable to the plaintiff . . . ." *Krell v. Queen Anne's Cnty.*, No. JKB-18-637, 2018 WL 6523883, at *2 (D. Md. Dec. 12, 2018) (other citations omitted).

In 2008, the Worcester County Sheriff created the Worcester Criminal Enforcement Team ("CET").   (ECF No. 33 at ¶ 6).   Designed as a stand-alone narcotics investigatory team with delegated authority from the County Sheriff's Office, the CET included police officers from the Worcester County Sheriff's Office, the Maryland State Police, and local municipalities.  *Id.*   The CET operates out of buildings provided by Worcester County, uses Worcester County equipment, and is subject to Worcester County and/or Sheriff's Office approval of personnel matters, expenses, and cooperative agreements with municipal governments.  *Id.*   At all times relevant to this action, the CET performed its own investigations and set its own priorities based upon county-specific narcotics issues and official policies loosely under the control of both Worcester County and the Worcester County Sheriff's Office.  *Id.* at ¶ 7.   At all times relevant to the case *sub judice*, Defendants were duly authorized agents and employees of the Worcester County Sheriff's Office and assigned and deputized as members of the CET.  *Id.* at ¶ 8 & 9.

Prior to the incident giving rise to Plaintiff's claims, Detective Converse was familiar with Plaintiff.  *Id.* at ¶ 10.   For purposes of the current litigation, Detective Converse has asserted that, acting within his capacity as a deputized member of the CET, he received a tip from an anonymous source that Plaintiff was actively selling narcotics in Worcester County.  *Id.*   Plaintiff disputes the veracity of this alleged anonymous tip.  *Id.*

On or about December 21, 2018, at approximately 12:48 p.m., Plaintiff was operating a 2008 Honda Accord traveling southbound on Worcester Highway at or near the intersection of Worcester Highway and Georgetown Road in Berlin, Maryland.  *Id.* at ¶ 11.  As Plaintiff drove through this location, Detective Converse was operating stationary radar.  *Id.* at ¶ 12.  Detective Converse claims that Plaintiff was traveling fifty-eight (58) miles-per-hour ("mph") in a fifty (50) mph zone.  *Id.* at ¶ 13.  Detective Converse activated his police vehicle's lights and pursued Plaintiff until Plaintiff pulled over on the side of the road.  *Id.* at ¶ 14.  Plaintiff denies that he was speeding at the time Detective converse initiated the traffic stop.  *Id.* at ¶ 13.  Detective Converse then approached the passenger-side of Plaintiff's vehicle and, upon questioning from Detective Converse, Plaintiff indicated that he was traveling back from Ocean City, Maryland where he had traveled to purchase Burger King for lunch.  *Id.* at ¶ 15.  At the time of the stop, Plaintiff was visibly eating, and Detective Converse observed a Burger King bag containing food in the passenger seat of Plaintiff's vehicle.  *Id.* at ¶ 16.  Plaintiff provided Detective Converse with his driver's license and a valid copy of the vehicle's registration.  *Id.* at ¶ 17.  At this time, Detective Converse had observed no signs of narcotics on Plaintiff's person, nor did he observe any indication that Plaintiff might be in possession of narcotics.  *Id.* at ¶ 18.

Detective Converse returned to his vehicle and began to process the information necessary to write a traffic violation warning or citation to Plaintiff for speeding.  *Id.* at ¶ 19.  At approximately 12:51 p.m., Detective Converse radioed into dispatch and requested that efforts be undertaken to see if a Maryland State Police K-9 unit was available for assistance.  *Id.* at ¶ 20.  Immediately after making this request, Detective Converse entered Plaintiff's license and vehicle information into the Maryland Electronic Ticket ("E-Tix") database using the computer terminal within his police vehicle.  *Id.* at ¶ 21.  E-Tix revealed no issues regarding Plaintiff's documentation.

*Id.*  At approximately 12:56 p.m., Defendant Converse radioed into dispatch for a second time and requested a warrant check on Plaintiff.  *Id.* at ¶ 22.  Dispatch immediately confirmed that Plaintiff's driver's license was valid and that there were no open warrants.  *Id.*  Following this second radio exchange, Detective Converse had all the information necessary to complete the traffic stop and issue Plaintiff a warning for speeding.  *Id.* at ¶ 23.

After Detective Converse had obtained all the necessary information to complete the traffic stop, Maryland State Police Corporal Orndorff ("Corporal") arrived on the scene with a K-9 unit. *Id.* at ¶ 24.  Detective Converse advised the Corporal that he was familiar with Plaintiff and that he believed Plaintiff had traveled from Delaware despite Plaintiff's assertion that he had traveled from Ocean City.  *Id.*  Detective Converse then told the Corporal to "give it a shot," and the Corporal replied that he was going to talk to Plaintiff.  *Id.*  At approximately 12:58 p.m., the Corporal ordered Plaintiff out of Plaintiff's vehicle, and Plaintiff complied with the order.  *Id.* at ¶ 26.  Plaintiff then walked to the back of his vehicle and stood face-to-face with the Corporal.  *Id.* at ¶ 27.  The two men shook hands, engaged in verbal communication, and then Plaintiff was subjected to a thorough physical search, during which (1) he raised his hands, (2) his torso and limbs were frisked, and (3) his pockets were patted down and subject to tactile inspection.  *Id.*  No narcotics, weapons, or other criminal implement were found.  *Id.*  Following the pat down, the Corporal had additional conversation with Plaintiff, and Plaintiff continued to be compliant throughout the course of this interaction.  *Id.* at ¶ 28–29.  From his police vehicle, Detective Converse witnessed the negative search of Plaintiff.  *Id.* at ¶ 29.

At approximately 1:00 p.m., Detective Converse exited his police vehicle and approached Plaintiff and the Corporal. Detective Converse and the Corporal then asked Plaintiff if he had something in his mouth, and Plaintiff responded that it was a chicken nugget.  *Id.* at ¶ 33.  Detective

Converse then grabbed Plaintiff's left arm and forcibly twisted it behind Plaintiff's back.  *Id.* at ¶ 34.  Detective Converse then engaged Plaintiff's neck and/or jawline and forced his mouth open. *Id.*  As this occurred, the Corporal engaged Plaintiff's right arm.  *Id.* at ¶ 35.  Both officers then maneuvered Plaintiff so that he was bent over the back of his vehicle, and Detective Converse continued to grab at Plaintiff's neck and jaw.  *Id.* at 36.  The officers then forced Plaintiff to his knees.  *Id.*  At this point, Detective Musgrave arrived and pushed Plaintiff from behind, which resulted in Plaintiff lying prostrate on the grass median next to Plaintiff's vehicle.  *Id.* at ¶ 37. Defendants and the Corporal forcibly held Plaintiff down on the ground by placing their knees on his back.  *Id.* at 38.  At this point, Plaintiff was unarmed, not resisting, and had the weight of three adult males on his back.  *Id.*  Detective Musgrave then deployed his taser twice into Plaintiff's lower back and once into Plaintiff's leg.  *Id.* at ¶ 39.  After Detective Musgrave's deployments of his taser, Defendants successfully placed Plaintiff in handcuffs.  *Id.* at ¶ 40.

Following Defendants placing Plaintiff in handcuffs, no narcotics were recovered from Plaintiff, his vehicle, or the vicinity around the vehicle.  *Id.* at ¶ 41.  The cabin and trunk of Plaintiff's vehicle were thoroughly searched, and no narcotics, weapons, or other illegal objects were found.  *Id.* at ¶ 42.

Berlin EMS arrived at the scene of the incident, and upon a preliminary evaluation, transported Plaintiff to Atlantic General Hospital for medical treatment.  *Id.* at ¶ 43.  At the hospital, Plaintiff underwent radiographic testing, and no foreign object was found in his digestive tract.  *Id.* at ¶ 44.  On December 21, 2018, Plaintiff was issued a traffic violation warning for exceeding the posted speed limit, and he was released from police custody while at the hospital. *Id.* at ¶ 45.  On January 10, 2019, Detective Converse wrote an Application for Statement of Charges in which he falsely claimed that Plaintiff had been observed to have a packet of cocaine

in his mouth at the time of the traffic stop, and he further falsely claimed that Plaintiff physically resisted the officers when they took Plaintiff to the ground. *Id.* at ¶ 46.   Based upon the representations made in the Application for Statement of Charges, Plaintiff was charged with (1) CDS: Possession – Not Marijuana, (2) resisting arrest, and (3) obstructing and hindering. *Id.* at ¶ 47.   On or about January 30, 2019, Plaintiff was arrested pursuant to the warrant that was issued based upon the misrepresentations contained in Detective Converse's Application for Statement of Charges.[2] *Id.* at ¶ 48.   On June 28, 2019, all charges against Plaintiff were dismissed. *Id.* at ¶ 49.

## II.   STANDARD OF REVIEW

### A.  Rule 12(b)(1) Subject Matter Jurisdiction—Eleventh Amendment Sovereign Immunity

Defendants assert that they are immune from suit in their official capacities because the incident giving rise to the case *sub judice* involved Defendants acting within their roles as sheriff deputies.  (ECF No. 36-1 at p. 12).   When a defendant raises the defense of Eleventh Amendment Sovereign Immunity, the Court "reviews that defense under Federal Rule of Civil Procedure 12(b)(1)." *Krell*, 2018 WL 6523883, at *3.[3]   The existence of subject matter jurisdiction, both constitutionally pursuant to Article III and statutorily pursuant to the various enabling statutes found in Title 28, is a prerequisite to the exercise of power by a federal court. *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479–80 (4th Cir. 2005) (citing *Steel*

---

[2] Plaintiff's Amended Complaint claims that the arrest of Plaintiff pursuant to an arrest warrant occurred on January 30, 2021, however, Defendants claim that this arrest occurred on January 30, 2019.  (ECF No. 36-1 at p. 9).  Plaintiff does not dispute Defendants' assertion, and an arrest date of January 30, 2019, fits within the timeline Plaintiff has otherwise described.

[3] "The fourth Circuit has not decided whether sovereign immunity is grounds for dismissal for failure to state a claim under Rule 12(b)(6) or for lack of subject matter jurisdiction under Rule 12(b)(1), but this Court favors analysis under Rule 12(b)(1) because immunity functions as a 'block on the exercise of that jurisdiction.'" *Id.* (quoting *Gross v. Morgan State Univ.*, 308 F. Supp. 3d 861, 865 (D. Md. 2018)).

*Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)).  Unlike personal jurisdiction which can be waived, subject matter jurisdiction cannot be conferred by any action by the parties.  *Id.* at 480.

State sovereign immunity originates in the Eleventh Amendment to the U.S. Constitution. Although the language of the Eleventh Amendment suggests that it deprives a federal court of subject matter jurisdiction over such claims, and some courts have reached that conclusion using a traditional analysis, the Fourth Circuit has noted important differences between a traditional subject matter jurisdiction analysis under Article III to the Constitution, and the hybrid jurisdictional analysis required by the Eleventh Amendment.  In *Constantine*, *supra*, for example, relying primarily on the fact that, unlike subject matter jurisdiction, Eleventh Amendment immunity can be waived by the parties and imposes no requirement on a court to raise it *sua sponte*, the Fourth Circuit concluded that Eleventh Amendment immunity does not deprive a court of subject matter jurisdiction in the traditional Article III sense.  *Id.* at 482.  At the same time, the Court noted that Eleventh Amendment immunity was not a mere affirmative defense given the reality that it is not simply a defense to a plaintiff's allegations, but a privilege designed "to prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties."  *Id.* (quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993)).  All this is to say that while the Eleventh Amendment cannot be considered a true limit on this Court's subject matter jurisdiction, it nonetheless blocks the exercise of that jurisdiction when present.  *Gross*, 308 F. Supp. 3d at 865.

Thus, notwithstanding the hybrid nature of Eleventh Amendment immunity, the decisions in this District have favored addressing Eleventh Amendment sovereign immunity under the rubric of a Rule 12(b)(1) analysis versus Rule 12(b)(6).  *Id.*; *see also Hammons v. Univ. of Md. Med. Sys.*

*Corp.*, 551 F. Supp. 3d 567, 579 n.6 (D. Md. 2021).  The Court will do so here.  This mechanism is also consistent with the Supreme Court's direction that because it establishes not just a defense but a privilege from suit, sovereign immunity should be addressed at an early stage of the case. *See Alden v. Maine*, 527 U.S. 706, 713 (1999).

Under Rule 12(b)(1), the plaintiff generally bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction.  *See Demetres v. E.W. Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015).  A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either as a facial challenge or a factual challenge. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 1999).  In a facial challenge, "the defendant must show that a complaint fails to allege facts upon which subject-matter jurisdiction can be predicated."  *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 621 n.7 (4th Cir. 2018) (citing *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017)).  In a factual challenge, however, "the defendant maintains that the jurisdictional allegations of the complaint are not true." *Hutton*, 892 F.3d at 621 n.7 (citation omitted).  "In that circumstance, the [C]ourt 'may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'"  *Est. of Bryant v. Balt. Police Dep't*, No. ELH-19-384, 2020 WL 673571 at *8 (D. Md. Feb. 10, 2020) (quoting *Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir. 2004)) (other citations omitted).

Although Defendants classified their challenge as facial in nature, Plaintiff supported his Opposition with evidence outside of the pleadings.  (ECF No. 41-1).  Defendants utilize Plaintiff's evidence and contend that it further supports Defendants' position.  Therefore, the Court considers Defendants' Eleventh Amendment challenge as a factual challenge to subject matter jurisdiction

predicated on the grounds of sovereign immunity, and the Court will consider the evidence presented in Plaintiff's Opposition.  *See Bryant*, 2020 WL 673571, at *8.

### B. Rule 12(b)(6)Failure to State a Claim

"Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a 'short and plaint statement of the claim showing that the pleader is entitled to relief.'"  *Love v. Rumgay*, No. RDB-13-1402, 2016 WL 1028001, at *4 (D. Md. Mar. 15, 2016) (quoting Fed. R. Civ. P. 8(a)(2)).  "Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted."  *Love*, 2016 WL 1028001, at *4.  The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Supreme Court of the United States' opinions in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 544 (2007), "require that complaints in civil actions be alleged with greater specificity than previously required."  *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (other citation omitted).  When ruling on a Rule 12(b)(6) motion to dismiss, a court must apply "[t]wo working principles . . . ."  *Iqbal*, 556 U.S. at 678.  First, although a court must accept as true all the factual allegations contained in a complaint, any legal conclusions that are drawn from those facts are not afforded such deference.  *Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice[]" to plead a claim).  Second, a complaint shall be dismissed if it does not allege a "plausible claim for relief . . . ."  *Id.* at 679.  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 663 (other citation omitted).  In determining whether a plaintiff has stated a plausible claim

for relief, a court must "draw on its judicial experience and common sense." *Id.* at 679 (other citation omitted).

Defendants style their Motion as a motion to dismiss under Rules 12(b)(1) and 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. "A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure." *Pevia v. Hogan*, 443 F. Supp. 3d 612, 625 (D. Md. 2020). The Court has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." *Id.* at 626 (other citation omitted). "Ordinarily, summary judgment is inappropriate where the parties have not had an opportunity for reasonable discovery." *Id.* (other citations and internal quotations omitted). "To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) . . . explaining why, for specified reasons, it cannot present facts essential to justify its opposition, without needed discovery." *Id.* (other citations and internal quotations omitted). Based on the fact-intensive nature of Plaintiff's claims, and Plaintiff's affidavit asserting the need for discovery (ECF No. 41-3, Ex. 3), the Court will decline to consider any evidence outside of the pleadings when determining the 12(b)(6) portion of Defendants' Motion. *See Love*, 2016 WL 1028001 (construing the defendant's motion as a motion to dismiss in a case involving the legality of a traffic stop and claims similar to Plaintiff's).

### C. Qualified Immunity

"The doctrine of qualified immunity shields government officials from liability for civil damages when their conduct does not violate clearly established constitutional or other rights that a reasonable officer would have known." *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019) (quoting

*Sims v. Labowitz*, 885 F.3d 254, 260 (4ᵗʰ Cir. 2018)).  "The doctrine is intended to balance[] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Hupp*, 931 F.3d at 317 (quoting *Smith v. Ray*, 781 F.3d 95, 100 (4ᵗʰ Cir. 2015)) (other citation and internal quotations omitted).  Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law."  *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (other citations and internal quotations omitted).

"An official is not entitled to qualified immunity if he or she deprived an individual of a constitutional right and that right was clearly established at the time of the violation."  *Hupp*, 931 F.3d at 317 (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  Therefore, the Court's analysis is two-fold: (1) the "[C]ourt must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right[,]" and (2) "the [C]ourt must decide whether the right at issue was clearly established at the time of defendant's alleged misconduct."[4] *Pearson*, 555 U.S. at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  "A clearly established right is one that is sufficiently clear [so] that every reasonable official would have understood that what he is doing violates that right."  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citation and internal quotations omitted).  Although a case directly on point is not required "for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate."  *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (citation and internal quotations omitted).

---

[4] This Court recognizes that "[b]ecause the two-step *Saucier* procedure is often, but not always, advantageous, the judges of the district courts . . . are in the best position to determine the order of decision-making that will best facilitate the fair and efficient disposition of each case."  *Pearson*, 555 U.S. at 242.

The qualified immunity analysis will be incorporated as a defense into Count I, which alleges federal claims.

### III.   ANALYSIS

#### A.  Eleventh Amendment Sovereign Immunity

The Eleventh Amendment bars suit against Defendants in their official capacities.  The Eleventh Amendment provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any foreign State."  U.S. CONST. amend XI. Therefore, under the Eleventh Amendment, "a state, its agencies, and its departments are immune from suits in federal court."  *Krell*, 2018 WL 6523883, at *5 (other citation omitted).  "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself."  *Id.* (other citation omitted).  "[O]fficial capacity claims are barred to the extent they seek monetary damages since the State's Eleventh Amendment immunity extends to state officials sued in their official capacities."[5]  *Id.* (other citations omitted).  Although the Eleventh Amendment prohibits suits against a state official in his or her official capacity, "Eleventh Amendment immunity does not extend to mere political subdivisions of a State such as counties or municipalities . . . ."  *Kitchen v. Upshaw*, 286 F.3d 179, 183–84 (4th Cir. 2022).

Plaintiff's sole argument against the application of the Eleventh Amendment to bar all of his official capacity claims against Defendants is that, as deputized officers of the CET, Defendants

---

[5] Although there are three exceptions to a State's sovereign immunity under the Eleventh Amendment, Plaintiff does not argue that any apply in this case.  *Hayat v. Fairely*, No. WMN-08-3029, 2009 WL 2426011, at *8 (D. Md. Aug. 5, 2009).  The three exceptions to Eleventh Amendment immunity include the following: (1) "a state may waive its immunity and consent to suit in federal court[,]" (2) the Eleventh Amendment does not bar a suit against a state official seeking prospective relief to end a continuing violation of federal law[,]" and (3) "Congress may validly abrogate the State's Eleventh Amendment immunity."  *Id.* (other citations omitted).

are "county employees." (ECF No. 41 at p. 11). In deciding the "liability of local governments under § 1983, [a court must] ask[] whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue." *McMillian v. Monroe Cnty. Ala.*, 520 U.S. 781, 785 (1997) (the issue was whether the sheriff acted for the state or the county when he acted in a law enforcement capacity). Furthermore, whether an official has final policymaking authority is dependent on an analysis of state law. *Id.* at 786. "Sheriffs in Maryland may be considered either state or, in limited circumstances, county officials." *Santos v. Frederick Cnty. Bd. of Comm'rs*, 346 F. Supp. 3d, 792, 793 (2018). Plaintiff provides what appears to be a novel argument asserting that a narcotics task force is under county control and, therefore, all officers deputized under such a task force should be considered local officials. However, this argument cannot withstand the weight of this Court's precedent mandating a contrary conclusion.

"In general, federal courts analyzing federal law claims against Maryland sheriffs follow *Rucker* in holding that the sheriff acts as a state official when exercising law enforcement functions." *Ledergerber v. Blubaugh*, No. JKB-20-1208, 2020 WL 7029868, *4 (D. Md. Nov. 25, 2020) (citing *Rossignol v. Voorhaar*, 321 F. Supp. 2d 642, 650–51 (D. Md. 2004) (county not liable for sheriff's actions when sheriff is exercising law enforcement function)); *see also McGrath–Malott v. Maryland*, No. RDB-06-879, 2007 WL 609909, at * 4 (D. Md. Feb 23, 2007) ("The role of a sheriff as a State constitutional officer whose duties are subject to control by the General Assembly leads us to the conclusion that sheriffs are state rather than local government employees. Because a deputy sheriff functions as the alter ego of the sheriff, and exercises the same authority, we reach the same conclusion with respect to deputy sheriffs."). In *Rossignol*, a case dealing with a sheriff's office's attempted suppression of an election day issue of a newspaper, this Court held that a "County Sheriff and his deputies are state officials when acting in their law

enforcement capacities." *See Rossignol*, 321 F. Supp. 2d at 651. In coming to this conclusion, the Court recognized that "Maryland county sheriffs are . . . designated constitutional officials for purposes of state law, Md. Const. art. IV § 44, with their salaries set by the state rather than the individual counties." *Rossignol*, 321 F. Supp. 2d at 651 (citing MD. CODE. ANN., CTS. & JUD. PROC. §2–309). Furthermore, the Court acknowledged that "Maryland's highest court has previously engaged in a detailed analysis of Maryland's Constitution and Code to conclude that a sheriff and his deputies are state employees." *Rossignol*, 321 F. Supp. 2d at 651 (citing *Rucker v. Harford Cnty.*, 316 Md. 275, (1989)).

Although the parties do not cite to it, *Blubaugh* proves constructive in determining this issue. In *Blubaugh*, the plaintiff filed suit against, amongst other defendants, Harford County, the Sheriff of Harford County, and a Deputy Sheriff of Harford County. *Id.* at *1. The claims included a variety of claims under the Federal Constitution and Maryland Declaration of Rights, as well as under various Maryland state law causes of action. *Id.* at *3. The claims arose out of conduct committed by deputy sheriffs assigned to the Harford County "Pawn Unit." *Id.* at *1. Similar to the goal of the CET in combatting illegal narcotics activity in Worcester County, the activity of the "Pawn Unit" in *Blubaugh* was calculated to be cast as a success in fighting the heroin epidemic. *Id.* at *2. The Court in *Blubaugh* dismissed the claims brought against Harford County pursuant to Section 1983 because "the events at issue involved the Sheriff's exercise of his authority as a law enforcement official, not a Harford County policy maker." *Id.* at *4. In its *Blubaugh* analysis, this Court considered (1) that the actions of the deputies in that case involved the enforcement of Maryland criminal law, (2) arrest warrants were issued by a Maryland grand jury, and (3) the sheriff took no action that could be construed as a policy decision on behalf of Harford County. *Id.* at *4.

Here, Plaintiff's Amended Complaint characterizes the CET as "a standalone narcotics investigatory team, with delegated authority from the County Sheriff's [O]ffice . . . ." (ECF No. 33 at ¶ 7). Plaintiff claims that the CET "performed its own investigations and set its own priorities based upon County-specific narcotics issues, and official policies loosely under the control of both Worcester County and the Worcester County Sheriff's Office, but no other government unit." *Id.* To further support his belief that the CET's deputized officers are county employees, Plaintiff directs the Court's attention to the goal of the CET described within the Minutes from the June 6, 2015 meeting of the County Commissioners of Worcester County: "[T]o reduce drug trafficking activities within Worcester County." (ECF No. 41-1, Ex. No. 1 at p. 3). However, the Court can see no difference between Harford County's "Pawn Unit" in *Blubaugh* and Worcester County's Sheriff's Office's CET. There is no indication that the CET was doing anything other than enforcing Maryland criminal law, particularly law related to illegal narcotics. Furthermore, the Court agrees with Defendants that any notion that they are county employees based upon their positions in the CET is undermined by Plaintiff's Exhibit No. 1. The Minutes make it clear to the Court that the CET is "headed up by the Sheriff's Office." *Id.* at p. 3. Additionally, the CET is self-funded by "30% of the seized funds . . . ." *Id.* Lastly, the Minutes reflect that the approval of Memoranda of Understanding ("MOU") by County Commissioners is usually unnecessary, but approval of the MOU referenced in the Minutes was recommended because the Commissioners were "forfeiting authority" and forfeiting "assets and the sharing of any proceeds from such assets." *Id.*

Plaintiff urges the Court to recognize *Dotson v. Chester*, 937 F.2d, 920 (1991), as analogous to Plaintiff's case. However, the Court encounters no difficulty in distinguishing these two cases. *Dotson* held that where a county sheriff serves as the final policymaker for operating

the county-funded county jail, the county may be liable under Section 1983.  *Dotson*, 937 F.2d at

932.  Here, the CET is headed up by the Sheriff's Office of Worcester County, and the goal of the

CET is to combat illegal narcotics activity in Worcester County.  *See Parker v. Bladen Cnty.*, 583

F. Supp. 2d 736, 740 n.2 (E.D.N.C. 2008) (finding that the sheriff's role as final policymaker

regarding personnel decisions was "of course . . . distinguishable" from the facts of *Dotson*);

*Harter v. Vernon*, 953 F. Supp. 685, 693 & n.8 (M.D.N.C. 1996) (drawing distinction between

county sheriff's policymaking authority over running a county-funded count jail and sheriff's

policymaking authority over employment decisions within the sheriff's office), *aff'd*, 101 F.3d 334

(4th Cir. 1996).  The Court is convinced that the CET's general exercise of state executive authority

clearly mandates the conclusion that Defendants were acting as state officials rather than county

officials when the incident giving rise to Plaintiff's claim allegedly occurred.  *See, e.g.*, *Hayat*,

2009 WL 2426011, at *10 ("this Court must rule in accordance with the long line of cases from

this circuit finding county sheriffs, as well as deputy sheriffs, to be state actors under the Eleventh

Amendment."); *Blubaugh*, 2020 WL 7029868, at *5 (finding defendants to be state officials when

enforcing Maryland criminal law); *McDonnell v. Hewitt-Angleberger*, No. WMN-11-3284, 2012

WL 1378636, at *4 n.3 (D. Md. Apr. 19, 2012) ("when engaged in law enforcement function,

sheriffs and deputy sheriffs are considered state employees, not county employees.").

Defendants acted as state officials at all times relevant to Plaintiff's claims,[6] and the

Eleventh Amendment bars all claims against Defendants in their official capacities. Accordingly,

---

[6] In Count V of the Amended Complaint, Plaintiff himself recognizes that the allegedly unlawful conduct of
Defendants was committed "under the color of their authority as members of the Worcester County Sheriff's Office
and while acting in the capacity of duly authorized police officers . . . ." (ECF No. 33 at ¶ 82).

to the extent that Plaintiff's claims are brought against Defendants in their official capacities, Defendants' Motion is hereby GRANTED without prejudice.[7]

## B. Failure to State a Claim

### 1. Federal Constitutional Claims (Count I)

Plaintiff has pleaded plausible claims of illegal search and seizure pursuant to the Fourth Amendment of the United States Constitution. "The Fourth Amendment prohibits unreasonable searches and seizures." *Joseph v. Maryland*, No. WDQ-13-0402, 2014 WL 494578, at *8 (D. Md. Feb. 5, 2014) (citing *Terry v. Ohio*, 392 U.S. 1, 8 (1968)). "Fourth Amendment reasonableness inquiries are fact-intensive." *Joseph*, 2014 WL 494578, at *8 (other citation omitted). "An officer's subjective motive for conducting a traffic stop is irrelevant if, objectively, he had reasonable suspicion to make the stop." *Id.* (other citations omitted). "If [the officer] lacked reasonable suspicion, the stop and any resulting search violate the Fourth Amendment." *Id.* (other citation omitted). If an officer observes a violation of traffic laws, such as speeding, the officer may make a traffic stop. *See id.* (other citation omitted). "Because a traffic stop is more analogous to an investigative detention than a custodial arrest, we treat a traffic stop, whether based on probable cause or reasonable suspicion, under the standard set forth in *Terry* . . . ." *United States v. Digiovanii*, 650 F.3d 498, 506 (4th Cir. 2011), *as amended* (Aug. 2, 2011). However, in performing the traffic stop, an officer cannot perform the stop for "longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). Activities such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance[]" are within the

---

[7] "A dismissal for lack of standing—or any other defect in subject matter jurisdiction—must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175 (4th Cir. 2013).

acceptable scope and duration of a traffic stop.  *Rodriguez v. United States*, 575 U.S. 348, 349 (2015).

Here, Plaintiff's Amended Complaint asserts that Plaintiff was not speeding at the time Detective Converse initiated the traffic stop.  Taking this allegation as true, Plaintiff has sufficiently pleaded that he was subjected to an illegal seizure pursuant to the traffic stop, and Plaintiff has sufficiently pleaded that he was illegally searched following the illegal traffic stop. Furthermore, Plaintiff has sufficiently pleaded that the traffic stop, even if legal, went beyond the permitted scope because Detective Converse had all the information necessary to complete the traffic stop at the point in which Detective Converse approached Plaintiff and the Corporal. Further assuming that Plaintiff was compliant with all the officers' orders and posed no threat to the officers, the subsequent tackling and handcuffing of Plaintiff, as well as searching him and his vehicle, would constitute further illegal searches and seizures.[8]

Plaintiff has also sufficiently pleaded a claim for excessive force pursuant to the Fourth Amendment of the United States Constitution.  "As in other Fourth Amendment contexts, . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  Fourth Amendment jurisprudence has "long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Id.* at 396 (citation omitted).  In applying the reasonableness standard to excessive force cases, courts consider "the severity of the crime at issue, whether the

---

[8] Notably, the Amended Complaint directly challenges the veracity of the alleged anonymous tip.  The reliability, or even existence, of such a tip will heavily impact any determination regarding the reasonableness of Defendants' conduct.

suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citation omitted).  Rather than focusing on any injury Plaintiff may have suffered, the Court should focus on "whether 'gratuitous violence' has been inflicted."  *Williams v. Maurer*, 9 F.4th 416, 439 (6th Cir. 2021).  In sum, in determining whether the force used against Plaintiff was excessive and thus unreasonable under the Fourth Amendment, the Court "balance[s] the nature and quality of the intrusion of the individual's Fourth Amendment interests against the countervailing government interest at stake."  *Graham*, 490 U.S. at 396.

Here, based on the Amended Complaint, Defendants had no justification for the initial traffic stop of Plaintiff, nor did Defendants have any justification for grabbing Plaintiff with the intent to place him in handcuffs.  At the time Defendants utilized force against Plaintiff, Plaintiff had not committed any crime, had been compliant with all requests from the officers, had been subjected to a thorough frisk search, posed no danger to anyone, and had not attempted to flee.  Furthermore, Plaintiff maintains that he did not fight against or resist Defendants when they were attempting to open his mouth and handcuff him.  Taking the facts alleged in the Amended Complaint in the light most favorable to Plaintiff, Plaintiff has sufficiently pleaded a claim of excessive force.

At this time, Defendants are not entitled to qualified immunity as to Plaintiff's federal claims.  Unless the complaint states a "violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."  *S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 265 (4th Cir. 1998) (other citations omitted).  As described above, Plaintiff has sufficiently pleaded claims of unlawful search, seizure, and excessive force.  Furthermore, at the time of the incident, the constitutional rights of Plaintiff that Defendants

allegedly violated were clearly established.  *See, e.g.*, *Henderson v. Simms*, 223 F.3d 267, 273 (4th Cir. 2000) ("the fourth Amendment right to be free of arrest without probable cause is a clearly established constitutional right."); *Barfield v. Kershaw Cnty. Sheriff's Office*, 638 Fed. App'x. 196, 203 (2016) ("a police officer's unprovoked tackling of a nonthreatening, nonresisting misdemeanor suspect to effect his arrest violates the Fourth Amendment."); *Rowland v. Perry*, 41 F.3d 167, 172–74 (4th Cir.1994) (rejecting qualified immunity where officer, unprovoked, attacked nonfleeing, nondangerous misdemeanor suspect to subdue him).  Plaintiff posed no threat to the officers, did not resist, and did not attempt to flee.  Despite this, Plaintiff was subjected to a twisting of his arm, being forced to the ground, attempts at forcing his mouth open, and multiple deployments of a taser.  At this point in the proceedings, Defendants are not entitled to qualified immunity.  *See, e.g.*, *Savage v. Mayor and City Council of Salisbury*, No. CCB-08-3200, 2010 WL 3038953, at *6 (D. Md. July 30, 2010) (refusing to grant qualified immunity at the summary judgment stage because the officers bore the burden of establishing qualified immunity and had not established the existence of probable cause permitting the arrest of plaintiff).

Although Defendant's apparently argue for the dismissal of Count I in its entirety, their Motion addresses only the alleged illegal search and seizure pleaded therein.  The Court recognizes that Plaintiff's Count I, "contain[s] vague and expansive allegations of federal . . . constitutional violations beyond those directly challenging [Plaintiff's] search and seizure." *McCollough v. Anne Arundel Cnty., Md.*, No. CCB-19-926, 2020 WL 836235, at *10 (D. Md. Feb. 20, 2020).  In addition to Plaintiff's claims regarding his search and seizure, Plaintiff alleges that he was "deprived of his liberty without due process of the law; . . . denied necessary medical treatment; and . . . summarily punished."  (ECF No. 33 at ¶ 58).  "Perhaps the defendants did not present arguments relating to these claims because they, like the [C]ourt, had difficulty understanding what

claims [Plaintiff] asserts in Count[] I . . . ."[9]  *McCollough*, 2020 WL 836235, at *10.  Nevertheless,

Defendants have not moved for a more definite statement under Federal Rule of Civil Procedure

12(e), and the Court declines to dismiss these additional claims absent an argument from

Defendants.  *See id.*  Accordingly, these unaddressed claims will proceed on the assumption that

Plaintiff may be able to clarify them in the future.  *See id.*

To the extent Count I is brought against Defendants in their individual capacities,

Defendants' Motion is hereby DENIED, and Count I will proceed.

## 2.  Maryland Declaration of Rights Claims (Count V)

"Articles 24 and 26 are read *in pari materia* with the Fourteenth and Fourth Amendments

to the United States Constitution, respectively."  *Warren v. Montgomery Cnty.*, No. PJM 09-2510,

2012 WL 3779165, at *5 (D. Md. Aug. 30, 2012).[10]  As Defendants assert in their Motion, the

outcome of Plaintiff's claims under the Constitution are determinative of his claims under the

---

[9] The Amended Complaint's lack of clarity is further exemplified in Defendants' Motion, wherein Defendants devote a portion of their Motion to arguing that Plaintiff was arrested pursuant to a valid arrest warrant issued in January 2019.  After careful review of the Amended Complaint and Plaintiff's Opposition, the Court cannot discern any indication that Plaintiff has brought a claim pertaining to his arrest on January 30, 2019.  Regarding the legality of the arrest of Plaintiff on January 30, 2019, Plaintiff's only mention of the issue comes within his list of relevant factual averments in his Opposition: "Defendant Converse falsified an Application for Statement of Charges that prompted a criminal prosecution which was later dismissed."  (ECF No. 41 at p.7).  In the event Plaintiff attempts to assert that such a claim has in fact been brought in the Amended Complaint, the Court will deem Plaintiff's failure to respond to Defendants' argument as a concession to the argument, and the Court will deem any such claims as dismissed without prejudice.  *See Fox v. Am. Airlines, Inc.*, 295 F. Supp. 2d 56, 58 (D.D.C. 2003) (noting that "when a plaintiff files a response to a motion to dismiss but fails to address certain arguments made by the defendant, the court may treat those arguments as conceded"), *aff'd* 389 F.3d 1291 (D.C. Cir. 20004).

[10] Although not apparent under Count V, Plaintiff brings his Maryland Declaration of Rights claims under Article 24 and 26. (ECF No. 33 at ¶ 55(b)). For clarification purposes, "Article 24 of the Maryland Constitution is not the proper vehicle under which to bring an excessive force claim arising out of an arrest. *Barnes v. Montgomery Cnty., Md.*, 798 F. Supp. 2d at 700. "It has been clearly established that Article 24 protects the same rights as the Fourteenth Amendment, and Article 26 protects the same rights as those protected under the Fourth Amendment." *Id.* (other citation omitted). Plaintiff evidently exercised caution by bringing federal and state constitutional claims under all potentially applicable portions of the Constitution and the Maryland Declaration of Rights. Plaintiff's constitutional claims arise out of his arrest, therefore, Defendants' Motion will be GRANTED without prejudice as to Counts I and V to the extent that those claims are brought under the Fourteenth Amendment and Article 24. *See Winston v. Haziminas*, No. GJH-19-0026, 2022 WL 1997206, at *5 (D. Md. June 6, 2022) (finding that allegations regarding excessive force arising out of an arrest "clearly invoke the fourth Amendment, not the Fourteenth Amendment.").

Maryland Declaration of Rights. (ECF No. 36-1 at p. 22). Therefore, to the extent Count V is brought against Defendants in their individual capacities, Defendants' Motion is hereby DENIED, and Count V will proceed.[11]

The inapplicability of Maryland Statutory Immunity as to Count V will be addressed immediately below.

### 3.  Counts II, III, and IV—Maryland Statutory Immunity

#### a.  Maryland Statutory Immunity

"Maryland Officials are granted immunity under the Maryland Tort Claims Act ("MTCA"), Md. Code State Gov't § 12-101 *et seq.*, for state constitutional violations committed within the scope of their duties when the violations are made without 'malice or gross negligence.'"[12] *Henry v. Purnell*, 652 F.3d 524, 536 (2011) (citing *Lee v. Cline*, 384 Md. 245 (2004); Md. Code State Gov't §§ 12–101(a)(6), 12–105)). Furthermore, as it pertains to Plaintiff's claims for battery, false arrest, and false imprisonment, the MTCA immunizes state government employees to the same extent as it would for state constitutional violations. *See Housley v. Holquist*, 879 F. Supp. 2d at 483 (other citation and internal quotations omitted). "Unlike qualified immunity from claims of violations of federal rights under § 1983, the question of immunity for State personnel from State law torts is a subjective one." *Housley*, 879 F. Supp. 2d at 483 (D. Md. 2011) (other citation omitted).

---

[11] Count V contains some of the same claims as Count I, i.e., illegal search, illegal seizure, and excessive force. Additionally, Count V, like Count I, asserts that Plaintiff was deprived of his right "not to be deprived of liberty without due process of the law." (ECF No. 33 ¶ 82). Because Defendants have not directly addressed this claim nor asked for a more definite statement, this claim will be permitted to proceed on the assumption that Plaintiff may be able to clarify it in the future.

[12] The Court wishes to clarify that the parties are not arguing for the applicability of Maryland's common law doctrine of qualified public official immunity. That immunity "has no application in tort actions based upon alleged violations of state constitutional rights or tort actions based upon most so-called 'intentional torts.'" *Lee v. Cline*, 384 Md. 245, 258 (2004).

An officer's actions are grossly negligent when they are "so heedless and incautious as necessarily to be deemed unlawful and wanton, manifesting such a gross departure from what would be the conduct of an ordinary careful and prudent person under the same circumstances so as to furnish evidence of indifference to consequences." *Henry*, 652 F.3d at 536 (other citation and internal quotations omitted). "Whether an officer's actions are grossly negligent, and therefore unprotected by statutory immunity, is generally a question for the jury." *Id.* (other citation omitted). Regarding malice, "the Court of Special Appeals [of Maryland] has long applied . . . some standard of 'actual malice' in defining 'malice' for the purposes of . . . immunity under . . . State and local tort claim laws." *Lee*, 384 Md. at 268 (other citation omitted). Under Maryland law, "actual malice" normally refers to "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud . . . ." *Id.* (quoting *Shoemaker v. Smith*, 353 Md. 143, 163 (1999)) (other citation and internal quotations omitted).

Here, taking the allegations in Plaintiff's Amended Complaint as true, Plaintiff has sufficiently pleaded the existence of gross negligence or malice to defeat—at this stage—Defendants' assertion of Maryland Statutory Immunity. As previously considered, Plaintiff was allegedly stopped without justification and subjected to a significant degree of force without justification. Such allegations indicate both a gross departure from the ordinary behavior of officers in the circumstances, and it permits an inference that Defendants acted with evil intentions throughout the duration of the incident.

Accordingly, Defendants cannot seek shelter at this time under Maryland Statutory Immunity as to Counts II, III, IV, or V. To that end, Defendants' Motion is hereby DENIED.

### b. Maryland Common Law Battery (Count II)

Plaintiff has sufficiently pleaded a claim of Maryland common law battery.   Under Maryland's common law, a battery is the "unpermitted application of trauma by one person upon the body of another person."  *McQuiggan v. Boy Scouts of Am.*, 73 Md. App. 705, 714 (1988). "[T]he tort of battery requires *intent* by the actor 'to bring about a harmful or offensive contact. . . . [It is] confined to intentional invasions of their interests in freedom from harmful or offensive contact.'"  *Janelsins v. Button*, 102 Md. App. 30, 35 (1994) (other citation omitted) (emphasis added by *Janelsins*).   The Court of Special Appeals of Maryland has recognized the privilege officers have to use reasonable force in effectuating a lawful arrest:

> The use of reasonable force to effectuate an arrest defeats a battery or an assault claim.  In other words, contact incident to an arrest cannot form the basis of a claim for battery.  Indeed, officers are privileged to commit a battery pursuant to a lawful arrest, *subject to the excessive force limitation* . . . .  If an officer uses excessive force, or force greater than is reasonably necessary under the circumstances, the officer may be liable.  In other words, an officer's nonprivileged use of force constitutes battery.

*French v. Hines*, 182 Md. App. 201, 265–66 (2008) (quoting *Sonja Larsen & Thomas Muskus*, 6A C.J.S. *Assault* § 35 (2008 Supp.)) (emphasis added by *French*).   "The standard for determining excessive force is the same whether the action is brought as constitutional claims or as claims of common law battery and gross negligence."  *Est. of Hammond v. Cox*, No. 07-C-14-002008, 2020 WL 5700718, at *3 n.9 (Md. Ct. Spec. App. Sept. 24, 2020) (citing *Richardson v. McGriff*, 361 Md. 437, 452–53 (2000); *see also Griffith-Guerrero*, No. 15-CV-0342-TOR, 2017 WL 2786472, at *8 ("the standards for adjudicating Section 1983 claims grounded on constitutionally prohibited excessive force are the same standards that apply to both state law assault and battery claims."); *Griffin v. Hardrick*, 604 F.3d 949, 956 (6th Cir. 2010) ("Where a plaintiff asserts a battery claim

under [state] law that arises out of the same use of force as her § 1983 excessive-force claim, the analysis is the same for both causes of action.").

Here, the Court has already determined that Plaintiff has sufficiently pleaded his excessive force claims.  Therefore, to the extent Count II is brought against Defendants in their individual capacities, Defendants' Motion is hereby DENIED, and Count II will proceed.

### c.   False Arrest and False Imprisonment (Counts III and IV)

Plaintiff has sufficiently pleaded his claims of Maryland common law false arrest and false imprisonment.  Under Maryland law, "the elements of false arrest and false imprisonment are identical: 1) the deprivation of the liberty of another; 2) without consent; and 3) without legal justification." *Gray v. Maryland*, 228 F. Supp. 2d 628, 641 (2002) (other citation omitted).  False arrest and false imprisonment can occur only when there is no legal justification for the officers' actions. *Williams v. Prince George's Cnty.*, 112 Md. App. 526, 554 (1996).

Here, Plaintiff alleges that he was illegally seized under the guise of a traffic stop and then subsequently arrested and placed in handcuffs.  He at no point felt free to decline Defendants' commands, and he asserts that he was obeying the speed limit when Detective Converse initiated the traffic stop.  Based on Plaintiff's Amended Complaint, Defendants deprived Plaintiff of his liberty without his consent and without legal justification.

Accordingly, to the extent Count III and IV are brought against Defendants in their individual capacities, Defendants' Motion is hereby DENIED, and Counts III and IV will proceed.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss or, in the Alternative for Summary Judgment, is GRANTED without prejudice in part and DENIED in part.  A separate order follows.

Date: December 9, 2022                                    _____/s/_____

                                                         J. Mark Coulson
                                                         United States Magistrate Judge